# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DONALD T. GAZAWAY,                      Case No. 1:20-cv-1024
      Petitioner,

                                         McFarland, J.
   vs.                               Bowman, M.J.

WARDEN, NOBLE CORRECTIONAL    **REPORT AND**
INSTITUTION,                          **RECOMMENDATION**
      Respondent.

Petitioner, an inmate in state custody, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his Butler County, Ohio, convictions.  (Doc. 1, at PageID 1).  This matter is before the Court on the petition (Doc. 1), respondent's return of writ (Doc. 10), and petitioner's reply to the return of writ (Doc. 12).

For the reasons stated below, the petition should be **DENIED**.

## I.    PROCEDURAL HISTORY

### State Trial Proceedings and Direct Appeal

On February 14, 2018, a Butler County, Ohio, grand jury returned a seven-count indictment charging petitioner with one count of felonious assault (Count One), one count of aggravated burglary (Count Two), one count of kidnapping (Count Three), one count of aggravated robbery (Count Four), two counts of having weapons while under disability (Counts Five and Six), and one count of inducing panic (Count Seven).  With the exception of the two counts of having a weapon while under a disability and the count for inducing panic, all counts carried accompanying weapon specifications.  (Doc. 9, Ex. 1).

Petitioner pleaded not guilty (*see* Doc. 9, Ex. 11, at PageID 132), and the case proceeded to a jury trial.  The Ohio Court of Appeals, Twelfth Appellate District, provided the following

summary of the facts that led to petitioner's convictions:[1]

{¶ 2}   The victim and her son lived in an apartment complex, along with the family's dog.  On the evening of the incident in question, the child was in his mother's bedroom playing video games when he heard yelling from the living room.  The child ran from his mother's bedroom into the living room and saw Gazaway, a man with whom he was familiar, pointing a gun at his mother's head and demanding $10,000.  When the child tried to call police from a phone in the apartment, Gazaway ran after the child and threw the phone on the floor breaking it.  During this time, the child's mother ran from her home.

{¶ 3}   After Gazaway searched the apartment for the woman but could not find her, Gazaway took the child and hid in a closet.  Police soon arrived at the apartment complex and the child's mother informed them that Gazaway was inside with her son.  The responding officers called the victim's cell phone, which was in the apartment, but Gazaway disconnected the calls and began firing his gun through the closet wall and door.

{¶ 4}   Soon thereafter, a SWAT team arrived on scene, including an armored vehicle and multiple officers.  Officers then evacuated the other inhabitants of the surrounding apartments.  Although no one was shot, bullets pierced the apartment's exterior windows, the SWAT vehicle where officers were located, as well as various parts of the apartment's interior.

{¶ 5}   The standoff lasted approximately 30 hours before Gazaway surrendered.  Police located three firearms and a multitude of spent and live ammunition in the home.  Gazaway was arrested and pled not guilty to the charges, claiming instead, that someone else fired the bullets that pierced the home and SWAT vehicle.

{¶ 6}   After a jury trial, Gazaway was convicted of felonious assault, aggravated burglary, kidnapping, having weapons under disability, inducing panic, and multiple accompanying firearm specifications.  The trial court sentenced Gazaway to an aggregate term of 41 and one-half years in prison. . . .

(Doc. 9, Ex. 11, at PageID 131-32).[2]  Petitioner was acquitted of the aggravated robbery charge.

(Doc. 9-4, at PageID 703).

---

[1] 28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence."  Because petitioner has not presented clear and convincing evidence to rebut the Ohio Court of Appeals' factual findings quoted herein, the state appellate court's factual findings are presumed to be correct.  *See McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir. 2004).

[2] As noted by the state court of appeals:  "The trial court filed a nunc pro tunc sentencing entry reflecting the 41.5 year sentence imposed at the sentencing hearing."  (Doc. 9, Ex. 11, at PageID 132).

Petitioner, through different counsel than at trial, appealed, raising the following five assignments of error on direct appeal:

1. Appellant's maximum sentences are clearly and convincingly contrary to law.

2. Appellant's consecutive sentences are clearly and convincingly contrary to law.

3. The convictions in this matter were not supported by sufficient evidence.

4. The convictions in this matter were against the manifest weight of the evidence.

5. Appellant was denied effective assistance of counsel.

(Doc. 9, Ex. 8). On December 16, 2019, the Ohio Court of Appeals affirmed petitioner's convictions. (Doc. 9, Ex. 11). On January 23, 2020, petitioner, proceeding pro se, appealed to the Ohio Supreme Court, raising the same assignments of error as were presented to the Ohio Court of Appeals. (Doc. 9, Exs. 12, 13). The Ohio Supreme Court denied further review. (Doc. 9, Ex. 17).

### Federal Habeas Corpus

In the instant habeas petition, plaintiff raises four grounds for relief:

**GROUND ONE**: Petitioner's maximum sentences are clearly and convincingly contrary to law.

**Supporting Facts**: To determine the petitioner's conduct was more serious than conduct normally constitutes the offense. The evidence in this case shows that this is not the most serious form of the offense.

**GROUND TWO**: Petitioner's consecutive sentences are clearly and convincingly contrary to law.

**Supporting Facts**: The record does not support the trial court's findings under the relevant statutes or that the sentence is otherwise contrary to law.

**GROUND THREE**: The convictions in this matter were not supported by sufficient evidence and were against the manifest weight of the evidence.

**Supporting Facts**: After viewing the evidence in the light most favorable to the prosecution any rational trier of fact could not have found the essential elements of

the crime beyond a reasonable doubt.

**GROUND FOUR**:  Petitioner was denied ineffective [sic] assistance of counsel.

(Doc. 1, at PageID 5, 7-8, 10).

Respondent has filed a return of writ asserting that petitioner's grounds for relief are non-cognizable on habeas corpus review or without merit.  (Doc. 10).  Petitioner has filed a reply in support of his petition.  (Doc. 12).  For the reasons below, the petition should be denied.

## II.  THE PETITION SHOULD BE DENIED.

In this federal habeas case, the applicable standard of review governing the adjudication of constitutional issues raised by petitioner to the state courts is set forth in 28 U.S.C. § 2254(d). Under that provision, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits by the state courts unless the adjudication either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

"A decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Otte v. Houk,* 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor,* 529 U.S. 362, 412–13 (2000)).  "A state court's adjudication only results in an 'unreasonable application' of clearly established federal law when 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 599–600 (quoting *Williams,* 529 U.S. at

4

413).

The statutory standard, established when the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) was enacted, is a difficult one for habeas petitioners to meet. *Id.* at 600. As the Sixth Circuit explained in *Otte*:

> Indeed, the Supreme Court has been increasingly vigorous in enforcing AEDPA's standards. *See, e.g., Cullen v. Pinholster,* __ U.S. __, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that AEDPA limits a federal habeas court to the record before the state court where a claim has been adjudicated on the merits by the state court). It is not enough for us to determine that the state court's determination is *incorrect*; to grant the writ under this clause, we must hold that the state court's determination is *unreasonable.* . . . This is a "substantially higher threshold.". . . To warrant AEDPA deference, a state court's "decision on the merits" does not have to give any explanation for its results, *Harrington v. Richter,* __ U.S. __, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011), nor does it need to cite the relevant Supreme Court cases, as long as "neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam).

*Id.* (emphasis in original). The Supreme Court extended its ruling in *Harrington* to hold that when a state court rules against a defendant in an opinion that "addresses some issues but does not expressly address the federal claim in question," the federal habeas court must presume, subject to rebuttal, that the federal claim was "adjudicated on the merits" and thus subject to the "restrictive standard of review" set out in § 2254(d). *See Johnson v. Williams*, 568 U.S. 289, 292 (2013).

Although the standard is difficult to meet, § 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). In other words, to obtain federal habeas relief under that provision, the state prisoner must show that the state court ruling on the claim presented "was so

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

The Supreme Court has made it clear that in assessing the merits of a constitutional claim under § 2254(d), the federal habeas court must apply the Supreme Court precedents that controlled at the time of the last state-court adjudication on the merits, as opposed to when the conviction became "final." *Greene v. Fisher*, 565 U.S. 34, 38–40 (2011); *cf. Otte*, 654 F.3d at 600 (citing *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)) (in evaluating the merits of a claim addressed by the state courts, the federal habeas court must "look to Supreme Court cases already decided at the time the state court made its decision"). In *Greene*, 565 U.S. at 38, the Court explained:

> [W]e held last term in *Cullen v. Pinholster*, 563 U.S. __, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011), that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the prisoner's claim on the merits. We said that the provision's "backward-looking language requires an examination of the state-court decision at the time it was made." *Id.*, at __, 131 S.Ct. at 1398. The reasoning of *Cullen* determines the result here. As we explained, § 2254(d)(1) requires federal courts to "focu[s] on what a state court knew and did," and to measure state-court decisions *as of 'the time the state court renders its decision.'*" *Id.*, at __, 131 S.Ct. at 1399 (quoting *Lockyer v. Andrade*, 538 U.S. [at] 71-72 . . .; emphasis added).

Decisions by lower courts are relevant "to the extent [they] already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court." *Otte*, 654 F.3d at 600 (quoting *Landrum v. Mitchell*, 625 F.3d 905, 914 (6th Cir. 2010)). The writ may issue only if the application of clearly-established federal law is objectively unreasonable "in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision." *McGhee v. Yukins,* 229 F.3d 506, 510 (6th Cir. 2000) (citing *Williams,* 529 U.S. at 412).

6

A.      **Grounds One and Two**

In Grounds One and Two, petitioner asserts, respectively, that his maximum and consecutive sentences are contrary to law.  Despite the conclusory presentation of these claims in his petition, the Court understands petitioner to be asserting the same challenges to his sentences that he raised in the state courts on direct appeal.  (*See* Doc. 1, at PageID 6-7 (checking boxes indicating that petitioner raised Grounds One and Two in his direct appeal)).

The Ohio Court of Appeals was the only state court to consider and issue a reasoned decision addressing the claims in Grounds One and Two.  The court overruled the assignments of error, reasoning as follows:

{¶ 40} Gazaway essentially argues that his sentence is contrary to law because he did not cause any harm to anyone and he never intended to harm anyone during the standoff.  However, and after reviewing the record, we find that the trial court properly sentenced Gazaway.

{¶ 41} Gazaway does not argue that the trial court failed to properly impose postrelease control or that his sentences were not within the permissible statutory range.  Instead, Gazaway asserts that the trial court failed to properly consider the purposes and principles of sentencing.  However, the trial court noted its express consideration of the statutory requirements of R.C. 2929.11 and R.C. 2929.12 in its sentencing entry and at the sentencing hearing.

{¶ 42} Furthermore, we find that the trial court's sentence is supported by the record.  Gazaway, who has an extensive criminal history, held a ten-year-old boy for 30 hours, many times at gunpoint, and used him as a human shield to protect himself from officers trying to end the standoff.  During this time, the child cried, screamed, spoke frantically, was afraid, and asked to be let go.  However, Gazaway refused to release the child and subjected him instead to repeated close-range gunfire.

{¶ 43} Gazaway used three firearms, one of which was an AK-47, during his standoff.  Gazaway's erratic and prolific gunfire could have easily resulted in serious injury or death to the child, as well officers and bystanders.  For example, had the SWAT vehicle not been protected with bulletproof glass, one SWAT team member would have been shot in the head.  The trial court made specific note of the "terror" Gazaway caused during the standoff, a terror that impacted the child, his mother, residents of the apartment complex, as well as multiple law enforcement officers.  The record fully supports the trial court's sentence.

{¶ 44} The trial court also made the proper consecutive sentence findings, as required by statute.  Specifically, the court determined that the consecutive nature of the sentences was necessary to protect the public from future crime and to punish the offender and that the sentences were not disproportionate to the seriousness of Gazaway's conduct and the danger it posed to the public.  The court also made a finding that Gazaway committed the crimes while on postrelease control from a prior felonious assault conviction and that the harm from Gazaway's conduct was so great or unusual that a single term did not adequately reflect its seriousness.

{¶ 45} After reviewing the record, we find that the trial court's sentence was not contrary to law, was supported by the record, and that the court made the requisite consecutive sentence findings.  As such, Gazaway's sentence is valid and his first and second assignments of error are overruled.

(Doc. 9, Ex. 11, at PageID 140-42).

Petitioner is not entitled to habeas relief based on Grounds One and Two.  As an initial matter, the Court has jurisdiction to review petitioner's claim only to the extent that petitioner challenges his confinement based on an alleged violation of the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law."  28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Wilson v. Corcoran,* 562 U.S. 1, 5 (2010) (quoting *Estelle v. McGuire,* 502 U.S. 62, 67–68 (1991)) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions").  Because habeas review is limited to claims implicating federal concerns, this Court lacks jurisdiction to consider any claim that the trial court erred under Ohio law in determining that the imposition of maximum, consecutive sentences was warranted in this case.  *Cf. Sneed v. Donahue,* 993 F.2d 1239, 1244 (6th Cir. 1993) (holding that a claim challenging the state prisoner's aggregate prison sentence "involves a matter of state law," which "is not cognizable in a federal habeas corpus proceeding").

Further, even assuming, *arguendo,* that Grounds One and Two could be construed to assert an issue of federal law, they fail to present a basis for habeas corpus relief.  Petitioner does

not assert that his sentences exceed the statutory maximums under Ohio law. (*See* Doc. 9, Ex.

11, at PageID 141). "Federal courts will not engage in a proportionality analysis except in cases

where the penalty imposed is death or life in prison without possibility of parole." *United States*

*v. Thomas,* 49 F.3d 253, 261 (6th Cir.1995) (citing *Solem v. Helm,* 463 U.S. 277, 103 S. Ct.

3001, 77 L.Ed.2d 637 (1983); *Rummel v. Estelle,* 445 U.S. 263, 100 S. Ct. 1133, 63 L.Ed.2d 382

(1980); *United States v. Dumas,* 934 F.2d 1387 (6th Cir.1990)). Additionally,

> State and federal courts have the power to impose consecutive sentences for
> multiple offenses, and the Supreme Court has called the practice of giving trial
> judges "unfettered discretion" to determine whether sentences for discrete offenses
> shall be served consecutively or concurrently a common-law tradition. *Oregon v.*
> *Ice,* 555 U.S. 160, 163, 129 S. Ct. 711, 172 L.Ed.2d 517 (2009). Imposition of
> consecutive terms of incarceration does not violate clearly established federal law
> construing the Due Process Clause, or make the state court proceedings
> fundamentally unfair.

*Powers v. Warden, London Corr. Inst.*, No. 2:13-CV-1179, 2015 WL 46136, at *4 (S.D. Ohio

Jan. 2, 2015). *See also See Barker v. Brunsman,* No. 2:09–cv–325, 2009 WL 1586209, at *2

(S.D. Ohio June 4, 2009) (finding that the "federal Due Process Clause is ordinarily not

implicated when a state court imposes consecutive sentences in a manner that appears to be

authorized by state law...."); *Taylor v. Tambi,* No. 2:08–cv–245, 2009 WL 1585209, at *2 (S.D.

Ohio June 4, 2009) (same).

 Accordingly, Grounds One and Two should be denied.

**B.     Ground Three**

In Ground Three, petitioner asserts that there is insufficient evidence to support his

convictions.[3]  As with Grounds One and Two, petitioner presents Ground Three in a conclusory

---

[3]To the extent that petitioner argues that his convictions are against the manifest weight of the evidence, that argument presents a question of state law and does not raise a question of violation of a federal constitutional right. *Tibbs v. Florida,* 457 U.S. 31, 47 (1982); *Johnson v. Havener,* 534 F.2d 1232, 1234 (6th Cir.1976).

manner.  However, the Court again understands petitioner to be reasserting the arguments he raised on direct appeal—namely that insufficient evidence was presented at trial to establish his guilt beyond a reasonable doubt on the charges for felonious assault, kidnapping, and aggravated burglary.  (*See* Doc. 1, at PageID 9 (checking box indicating that petitioner raised Ground Three in his direct appeal); *see also* Doc. 9, Ex. 8, at PageID 114-18).

The well-settled standard of review for evaluating the merits of constitutional claims challenging the sufficiency of the evidence was established by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  As the Supreme Court held in *Jackson*, because the Due Process Clause requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense, *In Re Winship,* 397 U.S. 358, 363-64 (1970), "the relevant question" in assessing the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson,* 443 U.S. at 319 (emphasis in original).

Under the *Jackson* standard, the State is not required to rule out every hypothesis except that of guilt beyond a reasonable doubt.  *Id.* at 326.  Rather, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Id.*; *see also Walker v. Engle,* 703 F.2d 959, 969-70 (6th Cir. 1983).  It is the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from the evidence.  *Jackson,* 443 U.S. at 319.  Consequently, the reviewing court is not permitted to reweigh the evidence, reevaluate the credibility of witnesses, make its own subjective determination of guilt or

innocence, or otherwise substitute its opinion for that of the jury. *See id.* at 318-19 & n.13; *see also United States v. Fisher,* 648 F.3d 442, 450 (6th Cir. 2011) (citing *Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. 2009)); *York v. Tate,* 858 F.2d 322, 329 (6th Cir. 1988) (per curiam).

"Circumstantial evidence alone is sufficient to support a conviction." *Newman v. Metrish,* 543 F.3d 793, 796 (6th Cir. 2008) (quoting *Johnson v. Coyle,* 200 F.3d 987, 992 (6th Cir. 2000)); *see also Fisher*, 648 F.3d at 450. Due process is satisfied as long as such evidence is enough for a rational trier of fact to make a permissible *inference* of guilt, as opposed to a reasonable *speculation* that the petitioner is guilty of the charged crime. *Newman,* 543 F.3d at 796-97 (and Sixth Circuit cases cited therein).

Moreover, federal habeas review of a claim challenging the sufficiency of the evidence is even further limited. As the Sixth Circuit explained in *Brown*, 567 F.3d at 205, the federal habeas court is "bound by two layers of deference to groups who might view facts differently than [the habeas court] would." The federal habeas court must defer not only to the trier of fact's findings as required by *Jackson*, but under 28 U.S.C. § 2254(d), must also "defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.* (emphasis in original); *see also Davis v. Lafler,* 658 F.3d 525, 531 (6th Cir. 2011); *Anderson v. Trombley*, 451 F. App'x 469, 474-75 (6th Cir. 2011). Therefore, as the Sixth Circuit went on to emphasize in *Brown*:

> [W]e cannot rely simply upon our own personal conceptions of what evidentiary showings would be sufficient to convince us of the petitioner's guilt. We cannot even inquire whether *any* rational trier of fact would conclude that petitioner . . . is guilty of the offenses for which he was charged. Instead, we must determine whether the Ohio Court of Appeals itself was unreasonable in *its* conclusion that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt based on the evidence introduced at trial.

*Brown,* 567 F.3d at 205 (emphasis in original).

11

The Ohio Court of Appeals was the only state court to issue a reasoned decision addressing petitioner's constitutional sufficiency-of-the-evidence claim on direct appeal.  The state appellate court found each of petitioner's convictions for felonious assault, kidnapping, and aggravated burglary to be supported by sufficient evidence:

{¶ 16} During trial, the state offered testimony from the child Gazaway took as a hostage during his standoff with police.  The child, who was familiar with Gazaway before the night in question, testified that he saw Gazaway pointing a gun at his mother's head and demanding $10,000 from her.  The child also testified that Gazaway followed him when he ran to call the police and that Gazaway forced him into the closet and began firing his gun once police arrived at the apartment complex.  Gazaway then took the child to another closet where he continued to fire different weapons, including an AK-47.  Gazaway also took the child into his mother's bathroom and fired the weapon several more times, breaking the toilet and causing bullet holes in the bathroom walls.

{¶ 17} The child also testified that police sent a robot into the apartment to deliver a phone to Gazaway and that Gazaway told him the phone could be an explosive or meant to electrocute them.  Gazaway then took the child into the garage out of fear that the robot was going to "rush" them.  The child testified that he and Gazaway saw police officers near the door to the garage.

{¶ 18} The child testified that he did not want to stay with Gazaway during the police standoff but did so because he was afraid Gazaway would shoot him.  The child explained that Gazaway would carry him on his back through the apartment and stand behind him when police officers were nearby.  The child further testified that Gazaway had a gun with him the entire time he was in the apartment, that Gazaway pointed a gun at him, and that he observed Gazaway fire the gun at police officers.  The child also testified that he was afraid during the standoff, was scared of being shot if he did not obey Gazaway's commands, and that Gazaway did not let him go despite his asking to be let go.  The child testified that the standoff eventually ended when he and Gazaway exited the garage and a SWAT member carried him to safety.

{¶ 19} The state then called a deputy with the Butler County Sheriff's Department who was involved in the incident when he received a dispatch that a female was running through the apartment complex screaming for help.  The deputy testified that he and three other deputies responded to the scene and that he made contact with the child's mother.  The deputy testified that when he tried to make contact with Gazaway inside the apartment, the phone calls were disconnected three times and that shots were fired from inside the apartment between the second and third phone calls.

{¶ 20} During the phone calls, the deputy identified himself as a police officer and verified that the child had not been shot. The deputy testified that he and the other deputies immediately called for backup and that a SWAT team arrived.

{¶ 21} The deputy further testified that when he first encountered the child's mother, she was frantic and that she told him "D" was in the apartment with her son. The deputy testified that the woman was wearing a tank top and sweatpants, but no shoes, which alarmed the deputy because there was snow on the ground. During the 13 hours the deputy was on the scene, he did not observe anyone enter or exit the apartment.

{¶ 22} The state next presented testimony from another deputy who was on the scene, and who had positioned himself near the front of the apartment. The deputy testified that when he moved toward the side of the apartment, a shot was fired from inside the apartment. He also heard other gunshots and heard the bullets ricochet in front of his police cruiser. During the time the deputy was on the scene, he did not observe anyone enter or exit the apartment.

{¶ 23} The state also presented testimony from a police captain who was the critical incident manager of the SWAT team deployed to the apartment. The captain testified that he observed gunshot holes through the window of the apartment, and also that he observed a man standing behind the child when the door to the apartment opened for a short time. The captain described the child as being "very scared," and that the child expressed a desire to leave the apartment.

{¶ 24} The captain also testified that when he was sitting in the front driver side of the armored SWAT vehicle, bullets fired from inside the apartment hit the vehicle, including one that struck the windshield. During the time the captain was in charge of the scene, he did not see anyone enter or exit the apartment.

{¶ 25} The state next called the negotiator who was present on the night of the incident and testified that his goal was to reach a peaceful conclusion to the standoff. In order to do so, he contacted Gazaway multiple times, often ending with Gazaway hanging up the phone. The negotiator testified that at one point during the incident, he was sitting in the SWAT armored vehicle when it was hit by a bullet fired from the apartment. The negotiator testified that the bullet struck the windshield "directly in front of" his face. The negotiator further testified that the SWAT team was eventually able to confine Gazaway and the child to the garage and that he was able to hear the child screaming and speaking frantically.

{¶ 26} The state next called a member of the SWAT team who testified that he observed shots fired from the apartment while he was in position in the garage. The SWAT officer also testified that his team observed Gazaway take the child from the apartment to the garage and that his team was eventually able to contain Gazaway and the child in the garage by wedging the door from the garage to the apartment shut so that Gazaway could not gain reentry.

{¶ 27} The state also called another SWAT team member who testified that he was positioned in the garage when he observed the door open and the child emerge with his small dog. The child, who was surprised to see the SWAT team members, dropped the dog and tried to recapture him before the door to the apartment opened and the child was pulled back inside.

{¶ 28} The SWAT team member also testified that he later observed the child when the team was trying to deliver a phone into the apartment. The team member testified that the child "looked scared to death," and that when the child looked toward the ground, the SWAT team could see that Gazaway was holding a gun to the back of the child's neck.

{¶ 29} Another SWAT team member also testified for the state that he observed the child and Gazaway sitting in one of the vehicles once the two were in the garage, that the child was crying and scared, and that Gazaway held a gun to the child the majority of the time. The SWAT team member also testified that he made an identification of Gazaway at the scene by comparing the man he saw in the car holding the child at gunpoint with Gazaway's photographs taken by the Ohio Bureau of Motor Vehicles.

The team member then made an in-court identification of Gazaway and later testified that he observed Gazaway's face multiple times during the standoff and that he was able to "tell it was [Gazaway]."

{¶ 30} The SWAT team member testified that eventually, the standoff came to an end when Gazaway exited the garage with his hands in the air and his pants around his ankles. The team was able to secure the child's safety and then placed Gazaway in custody.

{¶ 31} The state also presented testimony from a DNA expert who analyzed evidence removed from the apartment after the standoff ended. The expert testified that Gazaway's DNA matched DNA samples taken from evidence retrieved from the apartment.

{¶ 32} When viewed in a light most favorable to the prosecution, the evidence demonstrates that Gazaway committed felonious assault, aggravated burglary, and kidnapping during the standoff with police through his use of a firearm to trespass in the apartment, restrain the child's liberty, and fire weapons multiple times that could have resulted in death or serious harm to the multitude of officers and bystanders. While it is true that no one was injured during the standoff, the jury could infer from Gazaway indiscriminately firing multiple weapons toward officers in an area where he knew they were located, as well as the surrounding circumstances of the standoff itself, that he possessed an intent to cause serious physical harm to others and took substantial steps toward that end. *See State v. Sizemore*, 12th Dist. Warren No. CA2019-01-006, 2019-Ohio-4400, ¶ 27. ("A criminal attempt occurs when a defendant purposely does or omits to do something

which is an act or omission constituting a substantial step in a course of conduct planned to culminate in the commission of a crime. To constitute a substantial step, the conduct must be strongly corroborative of the actor's criminal purpose"). As such, Gazaway's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. Gazaway's third and fourth assignments of error are overruled.

!

(Doc. 9, Ex. 11, at PageID 134-39) (footnote omitted).

Applying the double-layer deferential standard to the case-at-hand, the undersigned is convinced that the Ohio Court of Appeals' sufficiency determination is neither contrary to nor an unreasonable application of *Jackson*.[4]

    A.    *Felonious Assault*

The Court first considers petitioner's challenge to the sufficiency of the evidence offered for the felonious-assault conviction. Ohio Rev. Code § 2903.11(A)(2) provides that: "No person shall knowingly . . . [c]ause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

The Ohio Court of Appeals reasonably found that the following facts, set forth above, provide sufficient evidence to support petitioner's felonious-assault conviction:

{¶22} The state next presented testimony from another deputy who was on the scene, and who had positioned himself near the front of the apartment. The deputy testified that when he moved toward the side of the apartment, a shot was fired from inside the apartment. He also heard other gunshots and heard the bullets ricochet in front of his police cruiser. During the time the deputy was on the scene, he did not observe anyone enter or exit the apartment.

{¶ 23} The state also presented testimony from a police captain who was the critical incident manager of the SWAT team deployed to the apartment. The captain testified that he observed gunshot holes through the window of the apartment, and also that he observed a man standing behind the child when the door to the

_____

[4]Although the Ohio Court of Appeals did not cite Supreme Court precedents in addressing petitioner's sufficiency-of-evidence claims, the court utilized the proper standard of review established by the Supreme Court in *Jackson* in assessing whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that petitioner was guilty of the charges. (Doc. 9, Ex. 11, at PageID 133).

apartment opened for a short time.  The captain described the child as being "very scared," and that the child expressed a desire to leave the apartment.

{¶ 24} The captain also testified that when he was sitting in the front driver side of the armored SWAT vehicle, bullets fired from inside the apartment hit the vehicle, including one that struck the windshield.  During the time the captain was in charge of the scene, he did not see anyone enter or exit the apartment.

{¶ 25} The state next called the negotiator who was present on the night of the incident and testified that his goal was to reach a peaceful conclusion to the standoff.  In order to do so, he contacted Gazaway multiple times, often ending with Gazaway hanging up the phone.  The negotiator testified that at one point during the incident, he was sitting in the SWAT armored vehicle when it was hit by a bullet fired from the apartment.  The negotiator testified that the bullet struck the windshield "directly in front of" his face.  The negotiator further testified that the SWAT team was eventually able to confine Gazaway and the child to the garage and that he was able to hear the child screaming and speaking frantically.

(Doc. 9, Ex. 11, at PageID 136-37).

In his traverse, petitioner argues that there was no evidence that he knowingly caused or attempted to cause physical harm with a deadly weapon because the child testified that petitioner said he fired shots to scare the police and there was no evidence that anyone was shot, hurt or injured.  (*See* Doc. 12, at PageID 779; *see also* Doc. 9, Ex. 8, at PageID 116).  The state appellate court addressed these arguments, finding:

> While it is true that no one was injured during the standoff, the jury could infer from Gazaway indiscriminately firing multiple weapons toward officers in an area where he knew they were located, as well as the surrounding circumstances of the standoff itself, that he possessed an intent to cause serious physical harm to others and took substantial steps toward that end.

(Doc. 9, Ex. 11, at PageID 138-39).

When viewing all of the evidence in the light most favorable to the prosecution, and for the reasons stated by the Ohio Court of Appeals, this Court concludes that the evidence was constitutionally sufficient to sustain petitioner's conviction for felonious assault.  *See State v. Sunderland*, No. 49950, 1985 WL 4620, at *3 (Ohio Ct. App. Dec. 19, 1985) ("The question

16

whether the evidence demonstrated that defendant acted merely to threaten another was for the jury to decide."); *see also State v. Buford*, Nos. 97218, 97529, 2012 WL 1566350, at *4 (Ohio Ct. App. May 3, 2012) ("A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." (quoting Ohio Rev. Code § 2901.22(B))); *State v. Gregory*, 628 N.E.2d 86, 91 (Ohio Ct. App. 1993) ("The shooting of a gun in a place where there is a risk of injury to one or more persons supports the inference that appellant acted knowingly."); *State v. Phillips*, 600 N.E.2d 825, 830 (Ohio Ct. App. 1991) (finding the defendant's "intent to cause physical harm to the five individuals could be inferred from his having shot a gun randomly in the direction of each individual.").

B.      *Aggravated Burglary*

Petitioner's challenge to the sufficiency of the evidence supporting his conviction for aggravated burglary is similarly without merit. Under Ohio law, to prove aggravated burglary the prosecution was required to show that petitioner:

> by force, stealth, or deception . . . trespass[ed] in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of [petitioner] [was] present, with purpose to commit in the structure . . . any criminal offense, if any of the following apply: . . . (2) [petitioner] has a deadly weapon or dangerous ordnance on or about [petitioner's] person or under [petitioner's] control.

Ohio Rev. Code § 2911.11(A)(2).

Petitioner argues in his traverse that there was insufficient evidence that he committed aggravated burglary because there was no testimony that he forced his way into the apartment, that either the child's mother or the child asked him to leave, or that he intended to commit any criminal offense in the apartment. (Doc. 12, at PageID 780). This Court is unpersuaded.

17

Under Ohio law, a person who enters a home with permission becomes a trespasser, subject to conviction for aggravated burglary, if he commits an act of violence against a person who has the authority to revoke the privilege of initial entry. *See State v. Hill,* No. 95379, 2011 WL 2112674, *4 (Ohio App. May 26, 2011) (citing *State v. Steffen*, 509 N.E.2d 383, 388 (Ohio 1987)). Here, evidence presented at trial showed that once inside the apartment petitioner held a gun to the child's mother's head and demanded money from her. (*See* Doc. 9, Ex. 11, at PageID 132). Petitioner then held the child at gunpoint during the remainder of the thirty-hour standoff. (*See* Doc. 9, Ex. 11, at PageID 134-35). The Court of Appeals therefore reasonably found that the evidence was sufficient to show that petitioner used "a firearm to trespass in the apartment." (Doc. 9, Ex. 11, at PageID 138). Further, that petitioner demanded money while pointing a gun at the mother (*see* Doc. 9, Ex. 11, at PageID 132) suggests that petitioner intended to commit a criminal offense. Although petitioner was ultimately acquitted of the aggravated-robbery charge, "[t]he [aggravated burglary] statute . . . clearly states that all that is required is a 'purpose to commit therein . . . any felony.'" *State v. Watkins*, No. 10252, 1987 WL 18832, at *2 (Ohio Ct. App. Oct. 26, 1987) (finding that the aggravated-burglary statute did not require a rape to be consummated where "the jury could have reasonably concluded that the defendant had a purpose to commit a rape, but that the victim later consented to the sexual acts."). In any event, the jury returned a guilty verdict on the kidnapping charge. The jury therefore could have relied on the purpose to commit aggravated robbery or to commit kidnapping in concluding that the defendant was guilty of aggravated burglary. *See id.*; *see also Hill,* 2011 WL 2112674, at *5 (holding that a defendant may form the purpose to commit a criminal offense at any point during the course of a trespass).

Accordingly, this Court finds that petitioner has not shown that the Ohio Court of

Appeals' adjudication of his challenge to the sufficiency of the evidence supporting his aggravated-burglary conviction was unreasonable.

C.     Kidnapping

Lastly, petitioner's challenge to the sufficiency of the evidence supporting his kidnapping conviction lacks merit.  Petitioner was convicted of kidnapping, in violation of Ohio Rev. Code § 2905.01(B)(2), which provides that:

> No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall knowingly do any of the following, under circumstances that create a substantial risk of serious physical harm to the victim or, in the case of a minor victim, under circumstances that either create a substantial risk of serious physical harm to the victim or cause physical harm to the victim: . . . (2) Restrain another of the other person's liberty.

Ohio Rev. Code § 2905.01(B)(2).

The Ohio Court of Appeals reasonably found that there was sufficient evidence to convict petitioner of kidnapping.  As noted above, the court found:

> {¶18} The child testified that he did not want to stay with Gazaway during the police standoff but did so because he was afraid Gazaway would shoot him.  The child explained that Gazaway would carry him on his back through the apartment and stand behind him when police officers were nearby.  The child further testified that Gazaway had a gun with him the entire time he was in the apartment, that Gazaway pointed a gun at him, and that he observed Gazaway fire the gun at police officers.  The child also testified that he was afraid during the standoff, was scared of being shot if he did not obey Gazaway's commands, and that Gazaway did not let him go despite his asking to be let go.  The child testified that the standoff eventually ended when he and Gazaway exited the garage and a SWAT member carried him to safety.
>
> * * *
>
> {¶23} The state also presented testimony from a police captain who was the critical incident manager of the SWAT team deployed to the apartment.  The captain testified that he observed gunshot holes through the window of the apartment, and also that he observed a man standing behind the child when the door to the apartment opened for a short time.  The captain described the child as being "very scared," and that the child expressed a desire to leave the apartment.

19

* * *

{¶ 25} The state next called the negotiator who was present on the night of the incident and testified that his goal was to reach a peaceful conclusion to the standoff.   In order to do so, he contacted Gazaway multiple times, often ending with Gazaway hanging up the phone. . . .  The negotiator further testified that the SWAT team was eventually able to confine Gazaway and the child to the garage and that he was able to hear the child screaming and speaking frantically.

* * *

{¶ 27} The state also called another SWAT team member who testified that he was positioned in the garage when he observed the door open and the child emerge with his small dog.  The child, who was surprised to see the SWAT team members, dropped the dog and tried to recapture him before the door to the apartment opened and the child was pulled back inside.

{¶ 28} The SWAT team member also testified that he later observed the child when the team was trying to deliver a phone into the apartment.  The team member testified that the child "looked scared to death," and that when the child looked toward the ground, the SWAT team could see that Gazaway was holding a gun to the back of the child's neck.

{¶ 29} Another SWAT team member also testified for the state that he observed the child and Gazaway sitting in one of the vehicles once the two were in the garage, that the child was crying and scared, and that Gazaway held a gun to the child the majority of the time.  The SWAT team member also testified that he made an identification of Gazaway at the scene by comparing the man he saw in the car holding the child at gunpoint with Gazaway's photographs taken by the Ohio Bureau of Motor Vehicles. . . . .

(Doc. 9, Ex. 11, at PageID 135-38).

Petitioner argues in his traverse that there was no testimony that the victim attempted to leave the home or that the victim was injured or deprived of necessities.  (Doc. 12, at PageID 779-80).  However, ample evidence was presented from which the jury could infer that petitioner compelled the child victim to remain in the apartment throughout the standoff under circumstances that created a substantial risk of harm to the child, in violation of Ohio Rev. Code § 2905.01(B)(2).  (*See* Doc. 9, Ex. 11, at PageID 135).

20

The Ohio Court of Appeals reasonably concluded that there was sufficient evidence to find petitioner guilty of felonious assault, aggravated robbery, and kidnapping. Therefore, Ground Three does not warrant habeas corpus relief and should be denied.

## D.     Ground Four

In Ground Four, petitioner asserts that trial counsel performed ineffectively. As with petitioner's previous three grounds for relief, the Court understands petitioner to be reasserting the arguments he raised on direct appeal, specifically that counsel was ineffective for failing to call the child's mother to testify and for failing to allow petitioner to testify in his own defense. (*See* Doc. 1, at PageID 10 (checking box indicating that petitioner raised Ground Four in his direct appeal)).

To establish that his trial counsel provided ineffective assistance in violation of the Sixth Amendment, petitioner is required to demonstrate both that (1) his trial attorney's conduct was constitutionally deficient; and (2) the attorney's deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Under the first prong of the *Strickland* test, petitioner had to show that his counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. *Id.* at 688. Judicial scrutiny must be highly deferential, and a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight" and to evaluate the challenged conduct from counsel's perspective at the time the conduct occurred. *Id.* at 689. In determining whether or not counsel's performance was deficient, the court must indulge a strong presumption that the challenged conduct fell within the wide range of reasonable professional assistance. *Id.*

21

To satisfy the second "prejudice" prong of the *Strickland* test, petitioner has to demonstrate that a "reasonable probability" exists that, but for his counsel's alleged error, the result of his trial would have been different. *See id.* at 694. That burden is satisfied only by a showing that the result of the trial would "reasonably likely have been different absent the error[]." *Id.* at 695.

In this federal habeas action, this Court must employ a "doubly deferential" standard of review in evaluating the reasonableness of the Ohio Court of Appeals' adjudication of petitioner's claims of ineffectiveness under *Strickland*. *See Woods v. Daniel,* 575 U.S. 312, 316-17 (2015); *Burt v. Titlow,* 571 U.S. 12, 15 (2013); *Premo v. Moore,* 562 U.S. 115, 122-23 (2011) (quoting *Harrington,* 562 U.S. at 104-05; *Knowles v. Mirzayance,* 556 U.S. 111, 123 (2009). Although "[s]urmounting *Strickland*'s high bar is never an easy task," *Harrington,* 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)), the AEDPA requires that a second layer of deference be accorded the state courts' adjudication of ineffective-assistance-of-counsel claims. The Supreme Court has explained:

> Even under *de novo* review, the [*Strickland*] standard for judging counsel's representation is a most deferential one.
>
> * * * *
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," . . . and when the two apply in tandem, review is "doubly" so . . . . The *Strickland* standard is a general one, so the range of reasonable applications is substantial . . . . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 689, and *Knowles*, 556 U.S. at 123); *see also Premo*, 562 U.S. at 122-23. Therefore, on federal habeas review, "[t]he pivotal

question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington*, 562 U.S. at 101.

Applying the standard set forth in *Strickland*, the Ohio Court of Appeals rejected petitioner's arguments that trial counsel performed ineffectively. The court explained:

> {¶ 50} Gazaway asserts that he was denied effective assistance of counsel because counsel did not call the child's mother as a witness and because he did not testify in his own defense. However, decisions specific to calling witnesses is within trial counsel's strategy and will not provide basis for reversal. *State v. Casey*, 12th Dist. Clinton No. CA2017-08-013, 2018-Ohio-2084. There is no indication that had the child's mother testified, she would have exculpated Gazaway in any way or supported his contention that someone else fired the gun from the apartment during the standoff. Nor is there an indication that Gazaway's own testimony would have resulted in a reasonable probability of a different result at trial particularly where there was overwhelming evidence of his guilt. There was significant testimony from the child, testimony from the officers that no one entered or exited the apartment during the standoff, in-court identification by SWAT team members identifying Gazaway as the person creating the standoff, as well as DNA evidence from the apartment implicating Gazaway.

> {¶ 51} Gazaway's arguments that his counsel's representation was deficient and prejudicial is based on speculation as to what testimony *might* have disclosed. However, this testimony could have, just as easily, aided the prosecution in proving its case and there is no indication that the jury would have discounted the testimony from the state's witnesses and believed Gazaway's account of the standoff. Mere speculation and unsupported suggestions of what might have been established does not demonstrate counsel's deficient performance nor the prejudice required to support an ineffective assistance of counsel claim. As such, Gazaway's final assignment of error is overruled.

(Doc. 9, Ex. 11, at PageID 141-42).

Applying the "doubly deferential" standard of review, as this Court is required to do, *see Woods*, 575 U.S. at 316-17, petitioner has failed to establish that relief is warranted. First, the state appellate court reasonably determined that counsel's performance was not deficient. *See United States v. Guerra*, 628 F.2d 410, 413 (5th Cir. 1980) ("Complaints concerning uncalled witnesses impose a heavy showing since the presentation of testimonial evidence is a matter of

trial strategy and often allegations of what a witness would have testified to are largely speculative."). Counsel determined not to call the child's mother or petitioner to testify after discussing the matter with petitioner at the close of the state's case, indicating a strategic decision. (*See* Doc. 9-4, at PageID 596-98; *see also* Doc. 14-1, at PageID 791-92 (excerpt from counsel's motion to withdraw hearing, which motion was denied). Further, counsel successfully defended against the aggravated robbery charge at trial, a charge based largely on petitioner's interaction with the child's mother. (*See* Doc. 9-4, at PageID 621-22 (excerpt from State's closing argument)). Counsel reasonably could have determined that calling the child's mother or petitioner to testify was unlikely to help the defense and could jeopardize the case. Next, given the speculative nature of petitioner's claim, the Ohio Court of Appeals also reasonably determined that petitioner had not demonstrated any prejudice from the decision not to call the child's mother or petitioner to testify. *See Fautenberry v. Mitchell*, 515 F.3d 614, 634 (6th Cir. 2008) (finding that "speculative argument is insufficient to support an ineffective-assistance claim").

Ground Four should therefore be denied.

Accordingly, in sum, this Court concludes that petitioner is not entitled to federal habeas corpus relief based on the grounds asserted in his petition.

## IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be **DENIED** with prejudice.

2. A certificate of appealability should not issue with respect to the petition because petitioner has not stated a "viable claim of the denial of a constitutional right" or presented an issue that is "adequate to deserve encouragement to proceed further." *See Slack v. McDaniel*, 529 U.S.

473, 475 (2000) (*citing Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).[5]

      3.      With respect to any application by a petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore **DENY** any petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

                                            *s/Stephanie K. Bowman*
                                            Stephanie K. Bowman
                                            United States Magistrate Judge

---

[5]*See Winburn v. Nagy*, 956 F.3d 909, 912 (6th Cir. 2020) ("Congress knew how to exempt § 2241 petitions from the certificate of appealability requirement when it wished, indicating that Congress chose to require certificates of appealability for state but not federal prisoners who invoke § 2241.").

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DONALD T. GAZAWAY,                           Case No. 1:20-cv-1024
      Petitioner,

                                 McFarland, J.
      vs.                                    Bowman, M.J.

WARDEN, NOBLE CORRECTIONAL
INSTITUTION,
      Respondent.

### NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).